UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF RHODE ISLAND

CHILEAN SEA BASS INC.,

        Plaintiff,

v.

KENDELL SEAFOOD IMPORTS, INC.

        Defendant.

C.A. No. _____

## COMPLAINT

Plaintiff Chilean Sea Bass Inc. ("CSB"), by its undersigned counsel, brings this action against Defendant Kendell Seafood Imports, Inc. ("Kendell"), and for its Complaint alleges as follows:

### NATURE OF THE ACTION

1. This action arises out of Kendell's breach of its contractual obligation to pay CSB an agreed upon amount of money for CSB's delivery from Chile to Kendell in the United States of more than 350 tons of Chilean Sea Bass in March 2020 and September 2020. Although Kendell paid CSB $3,902,846.50 of the total amount due and owing for Kendell's order of $6,452,382.70 in installment payments from January 2020 through March 2021, Kendell ceased further payments in March 2021 and owes CSB $2,549,749.70.

2. Kendell's failure to pay all sums due and owing to CSB pursuant to the parties' contract caused CSB to experience losses and damage to its business and to its reputation as an international supplier of Chilean Sea Bass. CSB brings this action seeking recovery of the unpaid balance of $2,549,749.70 owed by Kendell, together with incidental and consequential damages, plus interest.

## PARTIES

1. CSB is a corporation organized under the laws of the Republic of Panama with a principal place of business located Calle Del Arriero N°05872, Parque Industrial Tres Puentes, Zona 7, Punta Arenas, Republic of Chile.

2. Kendell is a Rhode Island corporation with its principal office located at 10 Brown and Howard Wharf, Suite 1, Newport, Rhode Island, 02840-3471.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the parties are a citizen of a "State", on the one hand, and a "subject of a foreign state" on the other hand.

5. This Court also has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331, because the Complaint presents a federal question on the grounds that it implicates application of the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), which is a treaty of the United States that grants a private right of action to CSB.

6. This Court has personal jurisdiction over Kendell because it is a citizen of the State of Rhode Island and the claims asserted against it arise out of Kendall's acts and omissions committed in the State of Rhode Island.

7. Venue is proper before the Court, pursuant to 28 U.S.C. § 1391(b)(1), because Kendell resides in this judicial district; and 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

**FACTUAL ALLEGATIONS**

8. At all relevant times, CSB has been engaged in the business of exporting and supplying large quantities of fish known as Antarctic and Patagonian toothfish to seafood distributors in the United States and Asia. Antarctic and Patagonian toothfish are sold indistinctively in the United States as "Chilean Sea Bass".

9. At all relevant times, Kendell has been engaged in the business of importing fish that it supplies to food service distributors in the United States. From 2016 to 2020, Kendell purchased substantial quantities of Chilean Sea Bass from CSB annually.

A. **Chilean Sea Bass Is Among the Most Expensive Commercially Available Finfish**

10. Chilean Sea Bass is a deep-water species that is caught in southern ocean waters near and around Antarctica including the almost 2 million square mile Ross Sea, a deep bay in the Southern Ocean off the coast of Antarctica. It is a different species type than the sea bass caught in U.S. waters.

11. Because of its white meat appeal to consumers, Chilean sea bass fetches premium prices in specialty U.S. markets and high-end restaurants. Chilean sea bass is among the most expensive commercially available finfish in the world.

12. CSB must comply with a rigid documentation system exists for legally caught Chilean Sea Bass. As required by U.S. Customs and the National Oceanic and Atmospheric Administration ("NOAA"), CSB exports Chilean Sea Bass to the U.S. accompanied by a document issued by the Conservation of Antarctic and Marine Living Resources ("CCAMLR"), stating that the fish was legally caught and evidence of valid dealer permit issued by NOAA.

13. Upon CSB's delivery of Chilean Sea Bass to the U.S., it is inspected by the U.S. Food and Drug Administration ("FDA") to verify that the imported fish complies with the FDA's requirements.

14. The toothfish fishing season in the area of the Eastern Ross Sea, where CSB's annual catch is located, generally occurs in the austral summer from December to March each year. After its catch, CSB's three fishing vessels bring the Chilean Sea Bass to CSB's warehouse in Punta Arenas, Chile where the fish is prepared and packaged for shipment to the U.S.

**B.      Kendell Placed Orders with CSB To Purchase Over 350 tons of Chilean Sea Bass**

15. In January 2020, as it had done in the prior four years, Kendell ordered a substantial delivery of frozen Antarctic toothfish (*i.e.*, Chilean Sea Bass) consisting of headed, gutted and tailed (known as "HGT") fish, collars, tails and cheeks.

16. Kendell's order, as had its orders in the prior two years, provided that it would purchase all of the Chilean Sea Bass caught by CSB during the 2019-2020 season. As a result, CSB did not pursue orders from any other customers for its catch during the 2019-2020 season.

17. In January 2020 when Kendell placed its order, CSB's fishing vessels were in the Ross Sea. As a result, CSB had not determined at that time the total quantity of fish it would catch for the 2019-20 season. CSB determined the total quantity of Chilean Sea Bass it had caught when its vessels returned to port.

18. Kendell ordered all of the Chilean Sea Bass that CSB caught during the 2019-2020 season subject to Kendell's agreement to pay CSB the following prices per kilogram for various fish portions: $17 for the first four aggregate kg of HGT; $17.00 for the next two aggregate kg (between 4kg and 6 kg); $21.00 for HGT in excess of an aggregate weight of 6 kg; $5.50 for collars and $4.00 for cheeks and tails ("Kendell's Orders").

19. Based on the agreed pricing structure, Kendell agreed to pay 50% of the total amount charged for the Chilean Sea Bass it ordered from CSB before shipping and the balance after FDA approved the shipments upon delivery to the port of destination in the U.S.

20. In reliance on Kendall's Orders, CSB issued three "proforma" invoices to Kendell: 1) invoice 2020-01 dated January 14, 2020 for $1,652,000; 2) invoice 2020-02 dated January 16, 2020 for $2,029,500; and 3) invoice 2020-03 dated January 16, 2020 for $2,147,650. The proforma invoices stated: "Quantities likely to increase as vessels continue fishing."

21. The proforma invoices were not demands for payment. Rather, they were proposed forms of invoices based on the contemplated catch at the time the order was placed and reflecting the agreed upon prices for various cuts of the Chilean Sea Bass.

22. Kendell endorsed each of the three proforma invoices representing its agreement with CSB's prices per kilogram of the various cuts of Chilean Sea Bass to fill Kendell's Orders.

C. **CSB Sent Invoices to Kendell Before Its March Shipments of Chilean Sea Bass**

23. CSB sent Kendell 17 separate invoices each dated February 26, 2020 reflecting various Chilean Sea Bass products, the volume of the various products, the total net weight, the agreed upon price per product and the total invoiced amount ("February 2020 Invoices"). (A copy of the February 2020 Invoices CSB sent to Kendall are attached hereto collectively as Exhibit A.)

24. The February 2020 Invoices reflected the following charges to Kendall:

(1)  Invoice No. 2020-01   $442,760.50   March Shipment
(2)  Invoice No. 2020-02   $478,916.55   March Shipment
(3)  Invoice No. 2020-03   $477,429.35   March Shipment
(4)  Invoice No. 2020-04   $482,607.30   March Shipment
(5)  Invoice No. 2020-05   $122,428.05   March Shipment
(6)  Invoice No. 2020-06   $107,854.95   March Shipment
(7)  Invoice No. 2020-07   $471,270.95   March Shipment
(8)  Invoice No. 2020-08   $482,773.20   March Shipment
(9)  Invoice No. 2020-09   $102,179.55   March Shipment
(10) Invoice No. 2020-10   $419,347.95   March Shipment
(11) Invoice No. 2020-11   $482,665.05   March Shipment
(12) Invoice No. 2020-12   $ 10,462.80   March Shipment
(13) Invoice No. 2020-13   $458,685.30   March Shipment
(14) Invoice No. 2020-14   $481,894.65   March Shipment
(15) Invoice No. 2020-15   $419,975.85   March Shipment

      (16)    Invoice No. 2020-16   $419,806.80   March Shipment
      (17)    Invoice No. 2020-17   $188,700.90   March Shipment

25. The total amount invoiced by CSB to Kendell by the March 2020 Invoices was $6,049,749.70.

26. In March 2020, in performance of filling Kendell's Orders as reflected on the February 2020 Invoices, CSB shipped 15 refrigerated (at -18°C) containers of packaged Antarctic toothfish from its place of business in Puenta Arenas, Chile to Staten Island, New York, Los Angeles, California and Fort Lauderdale, Florida ("March 2020 Shipments"), where the containers were received by Kendell's agent and then trucked to Kendell's warehouses.

27. As evidenced by duly issued bills of lading, the March 2020 Shipments included the following amounts of fish in each refrigerated container.

- 1 container of 1160 packages with a net weight of 22,838.75 kg;
- 1 container of 713 packages with a net weight of 22,805.55 kg;
- 1 container of 928 packages with a net weight of 22,981.30 kg;
- 1 container of 834 packages with a net weight of 22,987.9 kg;
- 1 container of 896 packages with a net weight of 22,820.75 kg;
- 1 container of 885 packages with a net weight of 22,899.75 kg;
- 1 container of 602 packages with a net weight of 22,989.2 kg;
- 1 container of 778 packages with a gross weight of 19,830.75 kg;
- 1 container of 787 packages with a gross weight of 19,968.95 kg;
- 1 container of 1113 packages with a net weight of 22,984.05 kg;
- 1 container of 941 packages with a net weight of 20,140 kg;
- 1 container of 778 packages with a net weight of 19,990.8 kg;
- 1 container of 894 packages with a net weight of 22,495.9 kg;
- 1 container of 715 packages with a net weight of 19,968.05 kg; and
- 1 container of 864 packages with a net weight of 23,175 kg.

**D.**    **<u>Kendell Unilaterally Delayed Payments Toward the Invoices</u>**

28. Before CSB shipped any of Chilean Sea Bass ordered by Kendell, it paid CSB $1,325,000 in four installments that CSB credited to the February 2020 Invoices.

29. As a result of the emergence of the COVID-19 pandemic and the lockdowns imposed by the federal and State governments in March 2020, Kendell advised CSB on March 20, 2020 that it had suspended payments for two weeks.

30. By letter dated March 27, 2020 to CSB, Kendell acknowledged and confirmed its "purchase of fish from the [CSB's fishing] vessels [named] Simeiz, Koreiz and Calypso for the season of 2019/2020 from Ross Sea/Amundsen is still in place. We have already paid $1,325,000 USD."

31. CSB did not consent to any modification of the payment terms agreed to by Kendell and CSB when Kendell placed its order with CSB in January 2020.

32. Kendell failed to pay CSB the amounts due and owing as had been agreed and instead paid periodic installments to CSB from time to time over the course of the next year.

33. From April 2020 and September 2020, Kendell paid CSB an additional seven installments for a total of $1,050,000 that CSB applied to seven of the February 2020 Invoices.

**E.   In September 2021, CSB Delivered Additional Chilean Sea Bass Ordered Kendell**

34. In September 2020, CSB completed its fulfillment of Kendell's order by shipping two additional containers of Chilean Sea Bass to Kendell.

35. Before CSB shipped the two containers, CSB sent Kendell three separate invoices each dated September 7, 2020 reflecting various Chilean Sea Bass products, the volume of the various products, the total net weight, the agreed upon price per product and the total invoiced amount ("September 2020 Invoices"). (A copy of each of the September Invoices are attached hereto as Exhibit B.)

36. The amount charged by each of the September 2020 Invoices included:

   (1)   Invoice No. 2020-18   $243,136.80   September Shipment
   (2)   Invoice No. 2020-19   $147,001.20   September Shipment
   (3)   Invoice No. 2020-20   $ 12,494.50   September Shipment

37. The total amount invoiced to Kendell by the September 2020 Invoices was $402,632.50.

38. In September 2020, in performance of Kendell's Orders, CSB shipped an additional 2 refrigerated (at -18°C) containers of packaged Antarctic toothfish from Puenta Arenas, Chile to Newark, New Jersey ("September 2020 Shipments"), where the containers were received by Kendell's agent and then trucked to Kendell's warehouses.

39. As evidenced by duly issued bills of lading, the September 2020 Shipments included the following amounts of fish in each refrigerated container.

- 1 container of 498 packages with a net weight of 15,196.05 kg; and
- 1 container of 589 packages with a net weight of 16,744 kg.

**F.**   **Kendell Accepted Delivery of All the Chilean Sea Bass Shipped by CSB**

40. CSB paid substantial sums for the freight, handling and other charges associated with delivery of the March Shipments and September Shipments to Kendell.

41. Kendell accepted March Shipments and the September Shipments in March and September 2020, respectively.

42. Kendell did not reject any of the March Shipments or the September Shipments.

43. Kendell did not revoke its acceptance of the March Shipments or the September Shipments within a reasonable time after it accepted the Chilean sea bass contained in those shipments.

**G.**   **Kendell Acknowledged Its Debt to Kendell but Ceased Payment to CSB**

44. Kendell agreed that the total price to be paid by Kendell to CSB for Kendell's Order equaled $6,452,605.90.

45. After its payment of $1,325,000 before delivery of the March 2020 Shipment, Kendell made 18 additional installment payments to CSB from April 2020 to March 2021 in the total amount of $2,577,846.50 ("Post-Delivery Payments").

46. As a result of Kendell failing to pay the February 2020 Invoices timely as it had agreed, CSB was unable to meet its financial obligations to other vendors resulting, among other things, in the embargo of one of its three vessels in Chile in November 2020. As a result of the embargo of CSB's vessel, CSB was unable to use that vessel for the 2020-21 fishing season and lost the opportunity to catch at least one-third of its expected annual Chilean Sea Bass catch.

47. CSB applied 14 of the Post-Delivery Payments to the February 2020 Invoices and applied four of the Post-Delivery Payments to pay off the three September 2020 Invoices in the total amount of $402,632.50.

48. Kendall paid CSB $3,902,846.50 of the total amount of the February 2020 Invoices and the September 2020 Invoices. Of that amount, CSB applied $3,500,000 to pay down the total amount due and owing on the February 2020 Invoices and $402,846.50 of the total amount due and owing on the September 2020 Invoices.

49. Kendell ceased any further installment payments to CSB of the remaining unpaid balance of the February 2020 Invoices after March 9, 2021.

50. Kendall owes CSB the total sum of $2,549,749.70 ("Arrearage"), which is the sum of the unpaid portion of the aggregate total of the February 2020 Invoices.

51. Despite CSB's repeated demand, Kendell has refused to pay the Arrearage.

52. Despite acknowledging the Arrearage and inducing CSB to forego exercise of its rights to payment, Kendall refused to pay CSB because it insisted that CSB "share in the burden that Kendall has absorbed in the past year [2020]".

53. Despite acknowledging the Arrearage and inducing CSB to forego exercise of its rights to payment, Kendall refused to pay CSB the Arrearage unless CSB agreed to discount the price of Chilean Sea Bass it sought to purchase from CSB in 2021.

54. Upon information and belief, Kendell has sold the entire amount of Chilean Sea Bass that CSB sold to it to unknown third party customers of Kendell.

55. Before the filing this Complaint, Kendall disclosed to CSB that it had fully drawn on its financing provided by Webster Bank and had pledged all its material assets to Webster Bank as security for its indebtedness to the bank.

56. Before the filing of this Complaint, Kendell disclosed to CSB that its financial condition was precarious and that it had entered into some form of arrangement, whether by joint venture or otherwise, with another entity, Grupo Profand S.L. ("Profand"), a fish supplier based in Spain, to enable it to continue to operate its business.

57. Before the filing of the Complaint, Kendell disclosed to CSB that it was unable to pay the Arrearage without the agreement and/or funding provided by Profand.

## COUNT ONE
### (Breach of Contract)

58. CSB incorporates by reference each of the allegations set forth above as if fully set forth herein.

59. CSB and Kendell entered into a valid and binding contractual agreement, pursuant to which CSB agreed to supply Chilean Sea Bass to Kendell.

60. Kendell agreed to pay CSB for the Chilean Sea Bass supplied by CSB subject to the terms and conditions agreed to by the parties.

61. Kendell has breached the parties' contract by failing and refusing to pay the Arrearage, the sum of $2,549,749.70, owed to CSB.

62. As a direct result of Kendell's breach and its effort to starve CSB of cash, CSB incurred damage to its business and reputation in the marketplace, which was reasonably foreseeable to Kendell.

63. As a result of Kendell's breach of the parties' contract, CSB has been damaged in an amount of not less than $$2,549,749.70, plus interest, together with incidental and consequential damages, costs and attorney's fees.

## COUNT II
### (Breach of Covenant of Good Faith and Fair Dealing)

64. CSB incorporates by reference each of the allegations set forth above as if fully set forth herein.

65. CSB and Kendell entered into a valid, binding contract wherein CSB discharged all of its contractual obligations thereunder.

66. A covenant of good faith and fair dealing was implied in the parties' contract.

67. Kendell breached its covenant of good faith and fair dealing by, among other things, by refusing to pay CSB the Arrearage unless CSB agreed to sell Kendall additional Chilean Sea Bass from CSB's 2020-21 catch at below market prices.

68. Kendell engaged in its conduct in bad faith either to deprive CSB of the fruits of its labor already earned or to leverage the parties' contractual terms unfairly in order to secure for itself an undue economic advantage over CSB.

69. As a result of Kendell's breach of the covenant of good faith and fair dealing, CSB has suffered compensatory, incidental and consequential damages.

## COUNT III
### (Book Account)

70. CSB incorporates by reference each of the allegations set forth above as if fully set forth herein.

11

71. As of the date of this Complaint, CSB's books and records reflect that Kendell owes CSB the Arrearage in the amount of $2,549,749.70.

72. Attached hereto as <u>Exhibit C</u> and incorporated by reference herein is CSB's statement of accounts payable by Kendell to CSB, which is maintained in the regular course of its business, showing (i) the total amount invoiced to Kendell totaled $6,452,382.20; (ii) application of Kendell's payments to CSB; and (iii) a total Arrearage of $2,549,749.70.

73. Kendell has failed to pay the Arrearage in the amount of $2,549,749.70 to CSB.

74. Accordingly, Kendell owes CSB on the book account the amount of $2,549,749.70, plus interest, costs and attorney's fees.

## COUNT IV
### (Unjust Enrichment)

75. CSB incorporates by reference each of the allegations set forth above as if fully set forth herein.

76. CSB has conferred a benefit on Kendell in the form of the Chilean sea bass it sold to Kendell.

77. Kendell appreciated the benefit it received from CSB by its retention and/or resale of some or all of the Chilean sea bass supplied by CSB to Kendell.

78. Kendell accepted the benefit it received from CSB under circumstances that it would be inequitable for Kendell to retain such benefit without paying the value thereof.

79. The value of the benefit conferred on Kendell without its payment equals the principal amount of the Arrearage totaling $2,549,749.70.

80. CSB has lost the benefit of the use of the money equal to the amount of the Arrearage since the date on which Kendell agreed to pay the February and September 2020 Invoices.

81. As a result of accepting a benefit from CSB and not paying the value thereof, Kendall has been unjustly enriched at the expenses and at the detriment of CSB.

82. As a result of its unjust enrichment, Kendell should be ordered to disgorge all monies, profits and gains it has obtained or will unjustly obtain in the future at CSB's expense.

83. A constructive trust should be imposed on all such monies, profits and gains obtained in the past or in the future.

84. A constructive trust should be imposed on the proceeds of the sale of any of the Chilean Sea Bass that CSB supplied to Kendell.

85. As a result of its unjust enrichment, Kendell should be ordered to pay CSB the sum of $2,549,749.70, plus interest, costs and reasonable attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Chilean Sea Bass Inc. respectfully requests that this Court enter judgment in its favor and against defendant Kendall Seafood Imports, Inc. as follows:

a. Awarding compensatory damages or, in the alternative, *quantum meruit* damages in at least the amount of $2,549,749.70;

b. Awarding incidental damages and/or consequential damages;

c. Awarding interest on the amount of any damages awarded to plaintiff, as permitted under R. I. Gen. Laws § 9-21-10, at the rate of 12% per annum;

d. Imposing a constructive trust and/or equitable lien on certain monies, proceeds and/or assets in defendant's possession custody or control;

e. Granting preliminary and/or permanent injunctive relief enjoining defendant from selling, transferring or otherwise disposing of certain monies, proceeds and/or assets in defendant's possession custody or control;

  f. Issuing a writ of attachment against defendant's property to secure defendant's satisfaction of a judgment in favor of plaintiff;

  g. Awarding reasonable attorney's fees pursuant to R. I. Gen. Laws § 9-1-45;

  h. Awarding costs of suit; and

  i. For such other and further relief as the Court deems just and proper.

Dated: August 16, 2021

            Respectfully submitted,

            PLAINTIFF

            CHILEAN SEABASS INC.

            By Its Attorneys,

            HIGGINS, CAVANAGH & COONEY, LLP

            */s/ Paul S. Callaghan*
            Paul S. Callaghan (#4931)
            10 Dorrance Street, Suite 400
            Providence, RI 02903
            Telephone: (401) 272-3500
            Facsimile: (401) 273-8780
            Email: pcallaghan@hcc-law.com

            Michael J. Geraghty
            *(Pro Hac Vice* Admission Pending)

            SILLS CUMMIS & GROSS P.C.
            101 Park Avenue, 28th Floor
            New York, New York 10178
            Telephone: (212) 643-7000
            Facsimile: (212) 643-6500
            mgeraghty@sillscummis.com