UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

———————————————————

CHILEAN SEA BASS INC.,
     Plaintiff,

    v.

KENDELL SEAFOOD IMPORTS,
INC.,
     Defendant.

———————————————————

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 21-cv-337-JJM-LDA

## FINDING OF FACTS,
## CONCLUSIONS OF LAW, AND FINAL ORDER

JOHN J. MCCONNELL, JR., United States District Chief Judge.

Chilean Sea Bass Inc. ("CSB") brings claims against Kendell Seafood Imports, Inc. ("Kendell") for breach of contract, breach of the covenant of good faith and fair dealing, payment on a book account, and unjust enrichment. ECF No. 1. Following a bench trial, the Court has reviewed the parties' proposed findings of fact and conclusions of law and now makes its findings and verdict under Fed. R. Civ. P. 52.

## I.     SUMMARY OF THE CASE

This is cautionary tale about the price of fish.  In January 2020, at the beginning of the COVID-19 pandemic, CSB contracted to sell over 350 tons of Antarctic toothfish[1] to Kendell.  Soon after, COVID-19 upended the domestic and international fishing markets, resulting in significant losses to both parties.  CSB

———————————

[1] Antarctic toothfish, along with Patagonian toothfish, are marketed to the public as "Chilean sea bass."  This action involves the less valuable species, Dissostichus mawsoni, which is fished in deep water off the coast of Antarctica.

now alleges that Kendell breached the contract, seeking $2,549,749.70 that it says remains unpaid.  Kendell argues that the contract was validly modified by Pedro Grimaldi, an affiliate of CSB who purportedly reduced the price to address the pandemic's effect on the market and maintain the business relationship.

Four issues control the breach-of-contract claim that the Court must decide. First, whether a contract was formed (and if so, at what price).  Second, whether Mr. Grimaldi had authority to modify the price, and whether he did so.  Third, whether the purported modifications are enforceable in the absence of a writing. Fourth, whether Kendell breached the contract, and if so, what damages are owed.[2]

After a bench trial, the Court finds the facts are as follows.[3]

## II.   FINDINGS OF FACT

### A.    Ownership of CSB

1. CSB is a Panamanian corporation that has its principal place of business in Punta Arenas, Chile.  Trial Tr. 11:9-14, Feb. 8, 2024.

2. CSB sells Antarctic and Patagonian toothfish ("Chilean sea bass"), which are fished in international waters, packaged in Chile, and sold to wholesalers in the United States and elsewhere.  *Id.* at 18:4-22:19.

---

[2] Because the Court is sitting in diversity in a case involving an international contract for sale of goods, it must also decide what law applies to each of these issues.

[3] As is true in many trials, there was often contradicting evidence here.  The Court weighed the evidence, including the credibility of the witnesses and the persuasiveness of the admitted exhibits, to make these findings of fact by a preponderance of the evidence.

2

3.  CSB charters three vessels, the Calipso, the Koreiz, and the Simeiz, which are owned by Neptuno Fishing Company, LLC, a Ukrainian entity owned by Carlos Celle, Alexander Celle, and Dmitri Marichev. *Id.* at 19:1-31:10.

4.  Mr. Grimaldi formed CSB with Carlos Celle on or around 2010.[4] Grimaldi Dep. 10:7-11:4, Feb. 14, 2024. His company, Meditor, owned the Simeiz through a company called Proteus Invest and managed fishing operations that were later transferred to CSB. Trial Tr. 186:9-18, Feb. 8, 2024. He became involved with Carlos and Alexander Celle as potential investors in the Koreiz. *Id.* at 41:12-44:21.[5]

5.  From 2012 to 2020, Mr. Grimaldi managed fishing operations for CSB and held himself out as the owner of all three vessels. Trial. Tr. 45:8-50:25, Feb. 9, 2024; Grimaldi Dep. 8:6-18, Feb. 14, 2024.

6.  In 2013, Mr. Grimaldi entered an agreement to sell his shares of Proteus Invest (and thus his ownership of the Simeiz) to Carlos Celle with a buy-back option in exchange for a line of credit to operate the Simeiz. As part of this agreement, Mr. Grimaldi was authorized to manage the fishing and

---

[4] While Mr. Grimaldi's current role with CSB is unclear, he was more than a passive "intermediary." Mr. Grimaldi owned at least two of the predecessor companies, co-signed a loan on behalf of CSB, performed essential services for CSB, and had detailed knowledge of the company's early history corroborated by Mr. Celle. Grimaldi Dep. 5:1-8:25, Feb. 14, 2024; Ex. 22a. He was involved in the purchase of all three boats and was originally a forty percent owner in the company. Trial Tr. 45:19-47:3, Feb. 9, 2024. Importantly, CSB never paid him as an employee. Assuming he did not work for free, this supports his claim that at some point, he was an owner or partner in CSB. Trial Tr. 41:6-49:1, 122:2-123:5, Feb. 8, 2024.

[5] By agreement of the parties, Mr. Grimaldi's deposition was admitted as evidence. The Court overrules any objections to facts relied on in this opinion.

commercial operations of the Simeiz during the term of repurchase. Trial Tr. 45:24-46:22, Feb. 8, 2024; Ex. 22a.

7. Mr. Grimaldi lost his right to repurchase the shares (and thus his ownership of the Simeiz) in 2015. Ex. 24a.

8. CSB is owned by Gestion, a Spanish holding company indirectly owned by Carlos and Alexander Celle. Trial. Tr. 12:24-13:15, Feb. 8, 2024.

9. Carlos Celle, Alexander Celle, and Gestion are the directors of CSB. *Id.* at 15:22-25.

10. There is an ongoing dispute over the ownership of CSB and the vessels.[6] Grimaldi Dep. 61:20-62:1, Feb. 15, 2024.

11. From 2015 to 2020, CSB continued to rely on Mr. Grimaldi to manage its fishing operations, including deals with American importers. Grimaldi Dep. 26:12-28:6, Feb. 14, 2024.

**B.    Kendell's Relationship with CSB and Pedro Grimaldi**

12. Kendell is an American importer that is owned and operated by Michael DellaGrotta with a principal place of business in Rhode Island. Trial Tr. 5:1-6:25, Feb. 16, 2024.

13. Mr. DellaGrotta is also a managing member of True North, an importer that has done business with CSB over the years. *Id.* In this action, the Court will treat Kendell and True North as the same entity.

---

[6] The Court takes no position on the current legal status of the vessels, CSB, or any affiliated company, as this dispute is not before the Court.

14. Mr. Grimaldi met Mr. DellaGrotta at the Boston seafood show in 1994 and has been selling Chilean sea bass to Kendell since 1996. *Id.* at 7:9-22.

15. Kendell customarily purchases Chilean sea bass directly from boat owners. *Id.* at 12:4-19.

16. Mr. DellaGrotta testified that he bought fish from Mr. Grimaldi and was invoiced "from Panama from a company by the name of [CSB]." *Id.* 13:23-25. He never inquired into CSB's ownership but testified that he had no reason to believe that Mr. Grimaldi did not own the vessels.[7] *Id.* at 9:9-13.

17. Between 2016 and 2020, Kendell negotiated with Mr. Grimaldi. It had no direct contact with Mr. Celle other than receiving invoices from CSB. *Id.* at 10:10-5, 25:12-20.

18. Between 2016 and 2020, CSB sold Kendell ninety percent of its catch. Trial Tr. 54:3-4, Feb. 8, 2024.

19. CSB never informed Kendell that Mr. Grimaldi lacked authority to enter contracts or negotiate the price of fish. *Id.* at 118:3-21.

**C.    Course of Dealing**

20. When Kendell buys fish from CSB, it engages in an ongoing process that starts with oral negotiations between Mr. DellaGrotta and Mr. Grimaldi,

---

[7] The Court finds him to be credible on this point. Mr. DellaGrotta testified that he had visited Mr. Grimaldi aboard his vessels and the crew recognized him as the owner. Trial Tr. 8:18-9:19, Feb. 16, 2024. Mr. Celle acknowledged that Mr. Grimaldi had access to the vessels and knew the crew personally. Trial Tr. 187:16-24, Feb. 8, 2024. And Mr. Grimaldi testified repeatedly that he believed himself to be the owner of the vessels. Grimaldi Dep. 89:3-101:25, Feb. 14, 2024.

an agreement in principle as to price and quantity, pro forma invoices (with a set price and estimated quantities), purchase orders, final invoices with actual quantities, and shipment of the fish. Trial Tr. 10:16-15:23, Feb. 16, 2024; Trial Tr. 154:13-20, Feb. 8, 2024.

21. Traditionally, these negotiations take place over the phone. Emails are sent through Mr. Grimaldi's private email rather than a CSB address. Trial Tr. 10:16-25, 26:1-6, Feb. 16, 2024.

22. Traditionally, the price is set by oral agreement between Kendell and Mr. Grimaldi and memorialized in writing through pro forma invoices.[8]

23. Traditionally, once the parties agree in principle on price, pro forma invoices are drafted by Mr. Celle and forwarded to Kendell by Mr. Grimaldi. *Id.* at 19:3-5. Kendell then pays fifty percent upfront, CSB ships the fish, and Kendell pays the remainder on delivery. Trial Tr. 68:5-25, Feb. 8, 2024.

---

[8] The Court makes this finding based on four facts. First, Mr. DellaGrotta testified that he relied on Mr. Grimaldi to set the price, which is corroborated by Mr. Grimaldi's claim that "[he] was the one" who priced the fish from 2010 to 2020. Trial Tr. 10:10-11:20, Feb. 16, 2024; Grimaldi Dep. 27:19-23, Feb. 14, 2024. Second, both parties agreed that Mr. Grimaldi was Kendell's primary contact, and that he often negotiated over the phone. Trial Tr. 52.8-54:25, Feb. 8, 2024. Third, Mr. DellaGrotta testified that "98 to 99 percent of all my negotiations with the boat owners is not communicated in any type of electronic or paper correspondence; it's by telephone, and it's by a gentleman's agreement. And for books and records purposes, documents are produced," suggesting that contracts were negotiated orally rather than by purchase order. Trial Tr. 22:2-6, Feb. 16, 2024. Fourth, an email from January 2020 states that Mr. Grimaldi "[c]losed with Kendell," providing the numbers that Mr. Celle used to invoice Kendell. Ex. 1a. A second email from September 2020 shows Mr. Grimaldi advising on prices for an unrelated catch. Ex. P. Nothing suggests that these emails were unusual.

24. Often, but not always, Kendell sends a purchase order after the pro forma invoices are sent, which serves as a written confirmation. *Id.* at 139:9-17.

25. Often, but not always, Kendell signs the pro forma invoices. *Id.* at 177:1-5.

26. Traditionally, if there is a dispute about an order, Kendell negotiates price adjustments directly with Mr. Grimaldi.[9]  Trial Tr. 17:4-14, Feb. 16, 2024.

27. If an order is modified, it is standard practice in the industry to issue a credit memo rather than to change an invoice. *Id.* at 141:8-10.

### D.    The 2020 Catch (before COVID-19)

28. In late 2019 and early 2020, Mr. Grimaldi and Mr. DellaGrotta began negotiating for the March 2020 catch.[10]  Mr. DellaGrotta expressed an interest in purchasing "all the cargo on all three of the vessels."  As usual, Mr. Grimaldi picked the price.  Mr. Grimaldi told Mr. DellaGrotta that $21 per kilo was a "fair price for the market conditions."  *Id.* at 36:1-38:19.

29. On January 16, 2020, Mr. Grimaldi emailed Mr. Celle and stated he had "[c]losed with Kendell, after your approval, as follows:

| Num | 2    | 3,000 kg | 17 USD c + f |
|-----|------|----------|--------------|
|     | 3    | 6,000    | 17           |
|     | 4    | 10,500   | 19           |
| Num | 5-11 | 225,000  | 21           |

---

[9] Prices are sometimes modified in the pro forma invoices, but the invoices are sent through Mr. Grimaldi. *See, e.g.,* Exs. A and 1a

[10] At the time negotiations began, the parties knew that COVID-19 was beginning to impact the Chinese market, but lockdowns had not yet disrupted operations in the United States or Chile.

| | | |
|---|---|---|
| Collar | 38,000 | 5.50 |
| Peaks | 1,500 | 5.50 |
| Faces | 2,000 | 4 |
| Tails | 2,500 | 3 |

500,000 advance per boat

Subject to increased quantities." Ex. 1a.

30. Mr. Celle responded with three pro forma invoices "so that they can make advance payments." *Id.* The invoices included substantively similar prices and quantities, with most of the units priced at $21 per kilo.[11] Ex. A.

31. Mr. Grimaldi forwarded the invoices to Mr. DellaGrotta, who initialed them but did not issue a purchase order. Trial Tr. 38:20-23, Feb. 16, 2024. Mr. Grimaldi testified that he did not request a purchase order because "[he] was sure that the [pro forma] prices were going to change." Grimaldi Dep. 30:15-22, Feb. 14, 2024.

32. Except for the purchase orders, this transaction aligned with "tradition" as the parties described it. Trial Tr. 124:9-125:1, Feb. 8, 2024.

33. On February 26, 2020, Mr. Celle sent final invoices totaling $6,049,749.70. The final quantity was just over 329,042 kilos, and the fish were set for delivery to California, New York, and Florida. Exs. C and 12.

---

[11] The pro formas reflect "corrected prices," which appear to be slightly adjusted and spread across all three invoices. Exs. A and 1a. Quantities were estimated because the Koreiz, the Simeiz, and the Calipso were still fishing. Trial Tr. 136:12-20, Feb. 8, 2024.

34. Between January and February 2020, Mr. DellaGrotta made advance payments of $1.325 million, or about $441,000 per boat. Ex. 12.

35. Mr. DellaGrotta testified that if COVID-19 had never happened, he would have paid $21 per kilo. Trial Tr. 128:1-8, Feb. 16, 2024.

## E.    The 2020 Catch (after COVID-19)

36. A quarantine was imposed in the United States in March 2020.

37. On March 20, 2020, Mr. DellaGrotta sent a letter to Kendell's suppliers, including CSB, advising them that it was temporarily stopping payments because restaurants in the United States had been closed. Ex. 5.

38. Mr. DellaGrotta told Mr. Grimaldi he could no longer accept the fish because there was nowhere to store it. He testified that under "force majeure," he had no duty to accept it. Trial Tr. 47:7-51:10, Feb. 16, 2024.

39. Mr. Grimaldi pressured Mr. DellaGrotta to take the fish. *Id.*

40. Mr. Grimaldi spoke to Carlos and Alexander Celle and suggested reducing the price by $6 per kilo. He testified that Carlos Celle preferred a $3 per kilo modification. They did not reach an agreement.[12] Grimaldi Dep. 44:8-45:16, Feb. 14, 2024.

41. At some point between March 20 and March 27, Mr. Grimaldi offered Kendell a price reduction of $6 per kilo "across the board" to induce

---

[12] CSB's objections to this testimony are overruled. The Court finds Mr. Grimaldi's story to be credible based on its detail and consistency with other parts of his testimony. Mr. Grimaldi stated that he did not need authorization from the Celles but often sought it, which squares with his understanding of himself as a part owner in the company.

Mr. DellaGrotta to accept the fish, offering his personal guarantee that Kendell would receive a discount.[13] Trial Tr. 60:18-62:8, 67:17-68:8, Feb. 16, 2024.

42. Relying on this promise, Kendell agreed to take the fish. *Id.* at 54:18-21.

43. On March 27, 2020, Mr. DellaGrotta sent a second letter to Mr. Grimaldi and Mr. Celle "confirm[ing the] agreements with your company for the purchase of fish from the vessels Simeiz, Koreiz, and [Calipso] for the season of 2019/2020 from [Ross Sea/Amundsen are] is still in place." The letter did not reference a modification or a change in the price. Ex. 6.

44. Kendell restarted payments and CSB shipped the fish. Trial Tr. 89:11-91:25, Feb. 8, 2024.

45. Sometime during this period, Kendell became aware that there was a legal dispute about ownership of the boats. Mr. DellaGrotta did not ask questions and continued to negotiate directly with Mr. Grimaldi. Trial Tr. 65:18-66:12, 92:19-94:25, Feb. 16, 2024.

46. Neither Kendell nor CSB recorded a price change, and there is no written record of a modification being given. Trial Tr. 34:3-25, Feb. 12, 2024.

---

[13] By volume, that is a discount of $1,974,253.20 and would reduce the total cost to $4,075,496.50. Kendell testified that this was comparable to the discounts it received from other suppliers during this period. Trial Tr. 56:6-57:9, Feb. 16, 2024.

47. Kendell continued to make partial payments.  By December 2020, it had paid $2.53 million toward the March catch.[14]  Ex. 12.

48. Mr. Celle repeatedly asked Mr. Grimaldi to have Kendell pay in full but did not reach out to Mr. DellaGrotta directly to demand payment.  Trial Tr. 165:16-168:12, Feb. 8, 2024.

49. Mr. Grimaldi told Kendell it would receive a credit memo documenting the modification.  Trial Tr. 124:3-8, Feb. 16, 2024.

50. Kendell never received a credit memo.  *Id.*

### F.    The 2021 Catch (Attempted Settlement)

51. In January 2021, Kendell changed its traditional approach and began negotiating directly with Mr. Celle regarding the 2021 catch. Mr. DellaGrotta emailed Mr. Celle a three-part proposal to satisfy the outstanding obligations for the 2020 season, stating that he would pay $500,000 upfront with the balance due on arrival of the 2021 catch.  He also proposed a new payment plan for the 2021 catch.  Mr. Celle responded by email and agreed "to settle the outstanding balance."[15]  Ex. 9a.

52. Neither email referenced a modification, or the total amount owed.

---

[14] During this period, Kendell entered a new contract with CSB for the September 2020 catch.  The contract was negotiated through Mr. Grimaldi in the same fashion at a reduced price ($402,632.50) and was fully paid.  Ex. 12.

[15] The Court sustained a Rule 408 objection to testimony on this email, which was admitted in full at the start of the trial by stipulation of the parties.  Because the Court excluded this discussion—and because the email has no information about what was owed or agreed upon—the Court will disregard it as evidence of settlement or modification but will admit it to establish the relationship between the parties.

53. Soon after, Mr. DellaGrotta made three payments totaling $500,000. He made two additional payments totaling $470,000. Ex. 12.

54. In March 2021, Mr. DellaGrotta met with Mr. Celle, who informed him that the Celles owned the vessels. Trial Tr. 195:6-15, Feb. 8, 2024.

55. Around this time, Mr. Grimaldi discussed a final modification with Carlos and Alexander Celle, arguing that Kendell's debt be forgiven in full. They did not come to an agreement. Grimaldi Dep. 61:10-19, Feb. 15, 2024.

56. Around this time, Mr. Grimaldi told Kendell the debt was satisfied. Trial Tr. 81:20-82:6, Feb. 16, 2024.

57. Kendell paid a total of $3.5 million for the March 2020 catch. Ex. 12.

## III.   CONCLUSIONS OF LAW

CSB brings claims for breach of contract, breach of the covenant of good faith and fair dealing, payment on a book account, and unjust enrichment. ECF No. 1. The Court starts with the breach-of-contract claim, exercising jurisdiction under 28 U.S.C. § 1331 (federal question) because the case involves the United Nations Convention on Contracts for the International Sale of Goods, a treaty to which the United States is a signatory. Apr. 11, 1980, S. Treaty Doc No. 98-9, 1489 U.N.T.S. 3 ("CISG").[16]   The Court also sits in diversity under § 1332(a)(2) because the case involves a Rhode Island citizen and a "[citizen] of a foreign state."

---

[16] Available online at https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/19-09951_e_ebook.pdf.

### A.    Breach of Contract

CSB argues that the parties formed a binding contract when Mr. DellaGrotta initialed the pro forma invoices, and that Kendell breached by accepting the goods without paying in full. It says Mr. Grimaldi lacked authority to negotiate on behalf of CSB, and that any purported modifications are unenforceable under the CISG and R.I. Gen. Laws § 6A-2-201 (statute of frauds). ECF No. 78. Kendell says Mr. Grimaldi was authorized to modify the contract and did so twice: in March 2020, reducing the price by $6 per kilo, and in March 2021, writing off the remaining debt. ECF No. 77.

The issues are 1) whether a contract was formed (and at what price); 2) whether Mr. Grimaldi had authority to modify it; 3) whether the statute of frauds bars enforcement of the purported modifications; and 4) whether Kendell breached its agreements with CSB (and if so, what damages are owed).

### 1.    Application of the CISG

For the reasons below, the Court finds that the CISG governs this contract. When an issue falls within the scope of the CISG, but the treaty is silent about how it should be resolved, the Court will seek to uphold its general principles.[17] CISG, art. 7(2). If none exist, the Court will apply a choice-of-law analysis under federal common law, following the Restatement (Second) of Conflict of Laws. Henry Mather,

---

[17] Issues that are "governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law." CISG, art. 7(2).

*Choice of Law for Int'l Sales Issues Not Resolved by the CISG*, 20 J.L. & Com. 155, 156-57 (2001); *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997).

1. The CISG is an international treaty incorporated as a statute within the United States and has the same validity. *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 337 (5th Cir. 2003).

2. It "applies to contracts of sale of goods between parties whose places of business are in different [Contracting] States" when the contract does not contain a choice-of-law provision. CISG, art. 1(a); *Am. Biophysics Corp. v. Dubois Marine Specialties*, 411 F. Supp. 2d 61, 63 (D.R.I. 2006).

3. The CISG governs "the formation of the contract of sale and the rights and obligations of the seller and the buyer." CISG, art. 4; *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 674 (N.D. Ill. 2005).

4. It does not govern the validity of any given contract. CISG, art. 4(a).

5. Because Kendell and CSB have their places of business in Contracting States (the United States and Chile), the CISG controls some, but not all aspects of the breach-of-contract claim. *See* Mather, *supra*, at 156.

6. The CISG governs issues related to formation, modification, breach, and remedies. CISG, arts. 14-25, 29, 74-77.

7. The CISG governs issues related to the statute of frauds and writing requirements. *Id.*, arts 11, 12, 96. Because there is a conflict as to which "version" of the CISG to apply, the Court will use a choice-of-law analysis,

applying federal common law.[18]    *See* Mather, *supra*, at 157; CISG-AC Opinion No. 15, Reservations under Articles 95 and 96 CISG, comment 4.17, Rapporteur: Professor Doctor Ulrich G. Schroeter, University of Mannheim, Germany. Adopted by the CISG Advisory Council following its 18th meeting, in Beijing, China on 21 and 22 October 2013 ("CISG-AC Opinion No. 15").

8. Agency issues are excluded from the CISG, but the Court retains federal question jurisdiction under 28 U.S.C. § 1331. CISG, art. 4(a); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (federal jurisdiction applies when a federal question appears on the face of a well-pleaded complaint). The Court will use a choice-of-law analysis, applying federal common law to decide what law applies. *See* Mather, *supra*, at 157.

## 2.    Formation

CSB argues that a contract was made when Mr. DellaGrotta initialed the pro forma invoices, with the price set at $21 per kilo. Kendell concedes that an agreement was made but argues that the price was "sliding scale." For the reasons outlined below, the Court finds that Kendell entered a valid oral contract, supported by a writing, to buy the bulk of CSB's March 2020 catch for $21 per kilo.

---

[18] The writing requirement still falls within the scope of the treaty and the Court's jurisdiction under 28 U.S.C. § 1331, so the Court analyzes choice-of-law under federal common law rather than Rhode Island law. *Chan*, 123 F.3d at 1297.

9. The CISG "allows for less formality in the establishment and modification of contracts" than the U.C.C. *Laktapol Int'l v. Bassett & Walker Int'l, Inc.*, EP-12-CA-16-FM, 2013 WL 12130452, at *4 (W.D. Tex. Jan. 10, 2013).

10. A contract under the CISG is formed when there is offer, acceptance, and a "meeting of the minds."[19]  CISG, arts. 14, 18, 23; *Simar Shipping Ltd. v. Glob. Fishing, Inc.*, 540 F. App'x 565, 567 (9th Cir. 2013).

11. A contract may be modified or terminated "by the mere agreement of the parties." CISG, art. 29(1).

12. Under the CISG, "[t]he parties are bound by any usage to which they have agreed and by any practices which they have established between themselves," as well as usage of trade. *Id.*, art. 9.

13. In January 2020, Mr. DellaGrotta said that he intended to buy "all the cargo on all three of the vessels." Per their custom, he negotiated directly with Mr. Grimaldi and relied on him to set the price. Mr. Grimaldi offered $21 per kilo, which he said was "a fair price for the market conditions."

14. Mr. DellaGrotta accepted.

15. This is a valid oral contract under the CISG. *Id.*, arts. 14, 18, 23.

---

[19] An offer must include a definite proposal, directed to one or more persons, that indicates the goods and expressly or implicitly makes a provision for determining price and quantity. CISG, art. 14. A contract is formed when the offeree assents through a statement or other conduct. *Id.*, arts. 18 and 23.

16. On January 16, 2020, Mr. Grimaldi emailed Mr. Celle and said that he had "closed with Kendell, after your approval"[20] and listed a range of quantities and prices, with most cuts listed at $21 per kilo. Mr. Celle sent Mr. Grimaldi three pro forma invoices, which he forwarded to Mr. DellaGrotta.

17. The invoices operated as a written confirmation of the oral agreement. *Cf. ReMapp Int'l Corp. v. Comfort Keyboard Co.*, 560 F.3d 628, 634 (7th Cir. 2009) (under Wisconsin law, pro forma invoices were written confirmation of an oral contract, not an offer accepted by payment).

18. Kendell owed $6,049,749.70 on these invoices.

### 3.    Modification

Under the CISG, a contract may be modified "by the mere agreement of the parties." CISG, art. 29(1). Mr. Grimaldi and Mr. DellaGrotta agreed to reduce the price by $6 per kilo in March 2020, and to write off the balance in March 2021. The Court must decide whether Mr. Grimaldi had authority to do so, and if so, whether the statute of frauds bars enforcement of the modified agreement. Because the CISG is silent on how to resolve these issues, the Court applies a choice-of-law analysis using federal common law. *See supra* Part III ¶¶ 7-8.

---

[20] The parties made much of this phrase, but the evidence suggests that when this email was sent, the key terms had already been agreed upon.

### a.    Choice of Law

19. Under the Restatement (Second) of Conflict of Laws, the Court asks which State has the most significant relationship to the contract, considering "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188 (1971).

20. The Court will also consider "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.* § 6.

21. In this case, the choice-of-law analysis yields no easy answers.

22. The contract was entered over the phone, and the Court has no information on where Kendell was negotiating in January 2020. The fish were caught in international waters and destined for ports in California, New York, and Florida. They were kept in cold storage during the height of the pandemic, but it is unclear where they were kept or whether the fish ever reached

their destinations.  The parties are domiciled in Chile and the United States, respectively, and CSB is incorporated in Panama.

23. There is no basis, given these facts, to give priority to the law of either country. *Id.* § 188.

24. Turning to policy considerations, the most important factors are maintenance of the international order, protecting the justified expectations of the parties, honoring the principles underlying the CISG, predictability, and the ease of determining and applying the law. *Id.* § 6.

25. It makes little sense to prioritize the policies of the forum, since Rhode Island's interest is tenuous at best (its only connection to the case is that Kendell is domiciled here).  The same is true for Chile.  Neither country has an obviously stronger interest in having its law applied.

26. The Court finds it relevant that CSB, the Plaintiff, selected a forum in the United States.  The parties assume that U.S. law applies to various aspects of the contract, and no one has proposed applying Chilean law to any issue.

27. Analyzing these issues under U.S. law serves the CISG's overarching preference for respecting the intent of the parties and finding an enforceable contract.  It also protects the justified expectations of the parties, who entered these agreements believing they would be enforced.

28. Analyzing these issues under U.S. law is a simpler and more predictable approach, given that CSB picked the forum.

29. Under the Restatement (Second) of Conflict of Laws § 191, place of delivery operates as a backstop when neither State has a more significant relationship—and here, the fish were delivered to the United States.

30. The Court thus finds it should apply the laws of the United States.

### b.    Apparent Authority

Applying U.S. law to the agency issues is straightforward: both Rhode Island and federal common law look to the Restatement (Second) of Agency.[21] *Steinberg v. Mikkelsen*, 901 F. Supp. 1433, 1437 (E.D. Wis. 1995); *Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys., Inc.*, 539 A.2d 523, 526 (R.I. 1988). For the reasons given below, the Court finds that Mr. Grimaldi had apparent authority to modify the contract in March 2020, but not in March 2021.

31. Apparent authority is based on the principal's relationship to third parties and exists if the principal has manifested to a third party that the agent has authority to act on its behalf.[22] Restatement (Second) of Agency § 8 (1958). The third party must act in good faith and reasonably believe, based on the principal's words or conduct, that the principal consents. *Id.* § 27.

32. Under Rhode Island law, a party must also show that "the third person, relying on such appearance of authority, has changed his position and will

---

[21] For the sake of completeness, the Court will analyze agency under Rhode Island law, which also evaluates detrimental reliance.

[22] The Court assumes without deciding that Mr. Grimaldi lacked actual authority to enter contracts on CSB's behalf. Even if the Court were to presume that Mr. Grimaldi retained some ownership interest in March 2020, the record shows that at times he acted unilaterally and over the objections of his purported partners.

be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal." *Soar v. Nat'l Football League Players Ass'n*, 438 F. Supp. 337, 342 (D.R.I. 1975), *aff'd sub nom. Soar v. Nat'l Football League Players' Ass'n*, 550 F.2d 1287 (1st Cir. 1977).

33. "Indicia of authority" may be provided by the agent and the principal need not communicate directly with the third party. For instance, apparent authority may be created by allowing the agent to enter contracts on the principal's behalf. *Menard*, 539 A.2d at 526.

34. Apparent authority may continue indefinitely until the third party receives notice that it has been terminated, the principal manifests that he no longer consents, or the third party learns of facts that would be grounds for rescission. Restatement (Second) of Agency § 125 (1958).

35. Revocation of actual authority does not terminate apparent authority if a third party reasonably believes that the principal agrees to be bound. *Id.*

### c.    March 2020 Modification

36. Mr. Grimaldi offered Kendell a $6 per kilo modification, which Kendell accepted in March 2020.[23] Mr. Celle did not authorize this modification.

37. The Court finds that CSB knowingly allowed Mr. Grimaldi to exercise authority on its behalf because even after Mr. Grimaldi lost his interest in

---

[23] CSB argues there is no evidence that Kendell accepted. The Court disagrees. Under the CISG, a party may accept by words or conduct (CISG, art. 18), and Mr. DellaGrotta credibly testified that he accepted the fish based on the promise to reduce the price. The parties may have disagreed as to whether $6 per kilo went far enough, but there is no question that the initial offer was made and accepted.

the Simeiz, CSB allowed him to manage fishing operations, relied on him to communicate with Kendell, and allowed him to set price and quantity.

38. Mr. Grimaldi had apparent authority to enter contracts based on the parties' course of dealing, as he had negotiated prior contracts for CSB.

39. Mr. Grimaldi also had apparent authority based on usage of trade because he held himself out to be the owner of the Simeiz.[24]

40. Kendell knew that Mr. Grimaldi was associated with CSB because it routinely received pro forma invoices on CSB letterhead confirming the terms of their agreements.

41. Establishing good faith is more challenging because at the time Kendell entered the agreement with Mr. Grimaldi, Mr. DellaGrotta knew there was a legal dispute over the ownership of the boats.

42. The Court nevertheless finds that Kendell acted in good faith based on the following facts. First, neither Mr. Grimaldi nor Mr. Celle took steps to fully apprise Kendell of the situation, and the record is silent on how much Kendell knew. Second, CSB knew that Mr. Grimaldi wanted to modify the March 2020 contract and did not notify Kendell that he lacked authority to do so. CSB took no steps, following the letter from Mr. DellaGrotta, to

---

[24] *See* Restatement (Second) of Agency § 49 (1958), comment c (if the principal knowingly permits the agent to occupy a position where it is "usual for such an agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority, in the absence of a reason to know otherwise."). Kendell testified that it was typical to contract directly with boat owners and that it had no reason to doubt that Mr. Grimaldi owned the boats.

confirm the purchase price or clarify Mr. Grimaldi's authority. It relied on Mr. Grimaldi to communicate with Kendell for the rest of 2020. Finally, $6 per kilo was comparable to other discounts that Kendell received, showing that Kendell's belief was reasonable.

43. Given that CSB had an opportunity to advise its customer of the facts, and chose not to, the Court finds that simply learning of the existence of a legal dispute is not enough to destroy apparent authority.

44. Because Mr. Grimaldi had authority to enter contracts, he also had authority to modify their terms. *See Menard*, 539 A.2d at 526.

45. Under Rhode Island law, courts also evaluate detrimental reliance, which is challenging since Kendell ostensibly obtained a benefit.

46. Kendell testified that under "force majeure," it had no duty to accept the fish. The Court finds Kendell to be credible on this point. Under the CISG, a party may be excused from performance if it can prove that failure to perform was "due to an impediment beyond [its] control" that could not have been expected or anticipated at the time of contracting.[25] CISG, art. 79.

47. The contract was entered in January 2020. Although the parties knew that COVID-19 had begun to impact the Chinese market, it was unforeseeable

---

[25] *See also* CISG-AC Opinion No. 20, Hardship under the CISG, Rapporteur: Prof. Dr. Edgardo Muñoz, Universidad Panamericana, Guadalajara, Mexico. Adopted by the CISG Advisory Council following its 27th meeting, in Puerto Vallarta, Mexico on 2–5 February 2020 ("CISG-AC Opinion No. 20"). Pandemic is envisioned as a hardship that might permit a party to avoid its obligations. *Id.*, comment 0.1.

that it would result in the near-total closure of the U.S. market.  It was thus reasonable for Kendell to assume it could exercise *force majeure*.

48. Kendell did not exercise this option but accepted the fish and continued to make payments based on Mr. Grimaldi's modification of $6 per kilo.

49. The Court thus finds that under the Restatement (Second) and Rhode Island law, Mr. Grimaldi had apparent authority modify the contract in March 2020.

### d.    March 2021 Modification

50. In January 2021, Kendell reached out directly to Mr. Celle to discuss the 2021 catch.  This was a change in their traditional course of dealing.

51. By opting to negotiate directly with Mr. Celle, the Court infers that Kendell knew that Mr. Grimaldi lacked authority to negotiate on CSB's behalf. Mr. Celle responded, which the Court views as an acknowledgment that for the 2021 catch, he was now the primary person with whom to negotiate. *See 731 Airports Assocs. v. H & M Realty Assocs., LLC ex rel. Leef,* 799 A.2d 279, 283 (R.I. 2002) (direct email communication with the seller refuted agent's apparent authority because it confirmed that the seller's approval was necessary to execute the agreement).

52. In March 2021, Mr. DellaGrotta was put on notice that Mr. Grimaldi did not own the vessels.  Restatement (Second) of Agency § 125 (1958).

24

53. In March 2021, Mr. Grimaldi told Kendell that the debt was settled, but because Kendell no longer reasonably believed Mr. Grimaldi was the party to deal with, he lacked authority to modify the contract.

54. The Court thus finds that this second modification was not a valid modification.

### e.    Statute of Frauds

The remaining question—here, a $2 million question—is whether the initial modification of $6 per kilo is enforceable in the absence of a writing. Kendell argues that the statute of frauds is waived based on the parties' course of dealing. CSB argues that the CISG controls, and that the modification is unenforceable because Chile has opted out of the CISG's provisions on oral contracts.

Neither approach offers a complete framework for navigating this challenging area of law. There is no First Circuit or Supreme Court authority on point, so the Court looks to the framework laid out by the International Sales Convention Advisory Council Opinion No. 15, which the Court finds to be highly persuasive.[26] For the reasons stated below, the Court finds that the statute of frauds does not apply and the initial, $6 per kilo modification is enforceable under the CISG.

---

[26] *See* CISG-AC Opinion No. 15. The International Sales Convention Advisory Council (CISG-AC) is an unaffiliated private advisory group that was initially supported by the Institute of International Commercial Law at Pace University School of Law and the Centre for Commercial Law Studies, Queen Mary, University of London. Its goal is to promote uniform understanding of the CISG. *Id.*

55. Article 11 of the CISG states that "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form. It may be proved by any means, including witnesses." CISG, art. 11.

56. The same rule applies to modifications under Article 29. *Id.*, art. 29(1) (a contract may be modified "by the mere agreement of the parties").

57. Under Article 12, a Contracting State may opt out of Article 11 and Article 29 by making a reservation under Article 96, permitting the parties to deviate from the CISG's "freedom of form" requirements.[27] Id., art. 12.

58. Chile has made an Article 96 reservation. The United States has not.

59. An Article 96 reservation has a "negative" effect, meaning that if either Contracting State has opted out, the Court does not have to enforce an oral agreement under the CISG. CISG-AC Opinion No. 15, comment 4.10.

60. It does not have the "positive" effect of mandating a writing in every instance. *Id.*, comments 4.17-4.20.

61. The majority view, adopted by the Advisory Council, is that the Court must use a choice-of-law analysis to determine which law applies when one country has made an Article 96 reservation but the other has not. *Id.*, comment 4.17. This is also the view adopted by the leading U.S. case on

---

[27] Article 12 specifies that parties "may not derogate from or vary the effect of this article." The Court takes this to mean that a country's Rule 96 reservation cannot be abrogated by agreement of the parties. *See* CISG-AC Opinion No. 15, comment 4.24. There is no evidence that the parties attempted to do so here.

this issue, *Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 398-99 (3d Cir. 2010); *see also* Mather, *supra*, at 167.[28]

62. Under the Restatement (Second) of Conflict of Laws, the Court finds that U.S. law applies. *See supra* Part III ¶ 30.

63. The Court should apply the law of the United States "in the same manner as a judge in that country would apply the law." CISG-AC Opinion No. 15, comment 4.22.

64. A judge in the United States must follow the Supremacy Clause, since treaties entered by the United States are incorporated as federal law and preempt competing state law. U.S. Const. art. VI, cl. 2; *Asante Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1150 (N.D. Cal. 2001).

65. The United States has made no Article 96 reservation, and the Court finds that Article 11 preempts any application of the U.C.C. statute of frauds.[29]

66. The Court thus finds that the March 2020 modification is enforceable.[30]

---

[28] The minority view, encouraged by CSB, would require a writing where either Contracting State makes an Article 96 reservation. *See Zhejiang Shaoxing Yongli Printing & Dyeing Co. v. Microflock Textile Grp. Corp.*, No. 06-22608-CIV, 2008 WL 2098062, at *3-5 (S.D. Fla. May 19, 2008), *amended*, No. 06-22608-CIV-O'SULLIVAN, 2008 WL 11333554 (S.D. Fla. July 23, 2008). The Court declines to follow this approach, opting instead for a choice-of-law analysis under CISG Article 7(2). *See* CISG-AC Opinion No. 15, comment 4.16.

[29] This finding aligns with the general principles of the CISG, which include respect for traditional course of dealing. CISG, art. 7(2). The record overwhelmingly suggests that the parties had a tradition of oral contracting through Mr. Grimaldi. While pro forma invoices and purchase orders were often used to validate these contracts, they were not the primary mechanism by which these contracts were made.

[30] This analysis is taken directly from CISG-AC Opinion No. 15. It differs from the approach taken in *Forestal Guarani* and Mather, which would apply the U.C.C. statute of frauds. Recognizing that it is a close call, the Court finds CISG-AC Opinion

### 4.    Breach

For the reasons outlined above, the Court finds that Kendell and CSB entered a valid modification in March 2020 to reduce the price by $6 per kilo but did not enter a second modification writing off the remaining debt.  Because Kendell did not pay the amount owed under the first modification, the Court finds it is in breach.

67. A contract is breached when one of the parties commits a "fundamental" breach i.e., if the detriment "substantially . . . deprive[s] [the other party] of what he is entitled to expect under the contract."  CISG, art. 25.

68. The elements of breach are the same as under U.S. common law: the Plaintiff must show formation, performance, breach, and damages. *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 924 (N.D. Ill. 1999).

69. Kendell received a $6 per kilo modification, resulting in a new agreement to sell the fish for $4,075,496.50.  *See supra* Part II ¶¶ 41-42, n. 13.

70. CSB performed its obligations by delivering the fish.

71. Kendell failed to perform its obligations, paying only a total of $3.5 million.

72. Kendell owes CSB a total of $575,496.50 for the March 2020 catch.

73. This is a fundamental breach under the CISG.  CISG, art. 25.

---

No. 15 to be more persuasive because it is a recent authority that takes an international approach, making it preferable to persuasive authorities in the United States.  It also discusses at length why the approach in *Forestal Guarani* (which applies Mather) should not be followed.  The Court agrees with this analysis.

## 5.    Damages

74. Under Article 74, damages consist of "a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach."

75. Damages must be foreseeable based on what Kendell knew, or ought to have known, at the time of the modification. *Id.*, art. 74.

76. Under Article 78, a party owed arrears also has a right to interest.[31]

77. It was foreseeable, when Kendell agreed to a $6 per kilo modification, that failure to pay would result in substantial and calculable losses to CSB.

78. Kendell owes CSB $575,496.50 in damages, plus costs and interest.

## B.    Breach of Covenant of Good Faith and Fair Dealing

The CISG imposes a duty of good faith and fair dealing. CISG, art. 7(1). The Court finds no evidence to suggest that Kendell was in breach. Kendell continued to make payments throughout 2020, reached out to CSB to negotiate a plan for the unpaid balance, and fully paid the balance for the September 2020 catch. Thus, the Court dismisses CSB's claim for breach of the covenant of good faith and fair dealing.

## C.    Book Account

Rhode Island recognizes claims based on an unpaid book account. *See Norlin Music, Inc. v. Keyboard 88 Inc., of Warwick*, 425 A.2d 74, 75 (R.I. 1981). Because the

---

[31] The CISG does not provide a method for determining the rate, and choice-of-law reveals competing options under U.S. law. *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F. Supp. 2d 702, 715-16 (N.D. Ill. 2004), *aff'd*, 408 F.3d 894 (7th Cir. 2005). Under federal law, the interest rate is at the discretion of the factfinder. *Robinson v. Pocahontas, Inc.*, 477 F.2d 1048, 1052-53 (1st Cir. 1973). Absent treaty language, statutory guidance, or applicable common law, the Court applies the forum's twelve percent rate. R.I. Gen. Laws Ann. § 9-21-10.

Court has found that the CISG controls the breach-of-contract claim and that the invoices were validly modified by oral agreement, the Court dismisses this claim.

### D.    Unjust Enrichment

Because the Court finds that the parties entered a contract for $21 per kilo (later modified), there is no claim for unjust enrichment. *See Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 162 (1st Cir. 2005). The Court dismisses this claim.

## IV.    VERDICT AND AWARD

The Court finds that Kendell breached its modified contract. Judgment shall enter for Chilean Sea Bass Inc. against Kendall Seafood Imports, Inc. for five hundred and seventy-five thousand, four hundred and ninety-six dollars and fifty cents, plus costs and interest.


IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court


May 22, 2024